UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| TORRY BUCHANAN, | Case No.: 15cv0059-BEN-MDD |
|---|---|
| Plaintiff, | **REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| RE. A. GARIKAPARTHI and DR. S. ROBERTS, | |
| Defendant. | **[ECF No. 48]** |

This Report and Recommendation is submitted to United States Districted Judge Roger T. Benitez pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

For the reasons set forth herein, the Court **RECOMMENDS** Defendants' Motion for Summary Judgment be **GRANTED**.

## I. PROCEDURAL HISTORY

Torry Buchanan ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma* pauperis, with a civil complaint filed pursuant to 42 U.S.C. § 1983. (ECF Nos. 1, 4). In his Complaint, Plaintiff sets forth two claims alleging

that his Eighth Amendment rights were violated by Doctors Garikaparthi and Roberts, who were deliberately indifferent to Plaintiff's serious medical needs. (ECF No. 4 at 2-4). Both of Plaintiff's claims are related to Defendants' alleged failure to provide adequate medical treatment that led to the amputation of three of Plaintiff's toes. (*Id.* at 3-4).

On July 13, 2017, Defendants filed a motion for summary judgment, and served a *Rand* notice on Plaintiff. (ECF No. 48). Plaintiff was given until September 19, 2017, to file his opposition, but as of the date of this Report and Recommendation, he has not done so.

## **II. FACTUAL BACKGROUND**

Defendants have produced evidence of the following facts.[1] In 2002, Plaintiff was shot, resulting in right foot drop, which made his foot susceptible to additional injury. (ECF No. 48-3 at ¶8). Plaintiff received accommodations for his foot from prison staff including orthosis, a cane, and special shoes. (*Id.*). Additionally, it was recommended that Plaintiff not have prolonged periods of either standing or sitting. (*Id.*).

In October, 2012, Plaintiff was first seen by Dr. Sedighi for treatment of a wound on his right foot's big toe. (Id. at ¶9). According to medical records, Plaintiff indicated that he had had a blister for three weeks, but did not present for medical care until shortly before his scheduled appointment with Dr. Sedighi. (*Id.*) The wound appeared "superficial with no discharge," but "out of an abundance of caution," Plaintiff was given a round of oral antibiotics and instructed to have his dressings changed daily with topical antibiotics. (*Id.*) Plaintiff also had an x-ray taken which showed no

---

[1] These facts are undisputed because Plaintiff has not filed an opposition or put forth any evidence disputing them.

underlying osteomyelitis or other bony abnormality. (*Id.*) Because Plaintiff's foot drop was known, a podiatry referral was made, with the appointment focusing on new accommodations for Plaintiff. (*Id.* at ¶11). At this November 9, 2012 appointment, Plaintiff refused wound care. (*Id.*).

On November 20, 2012, a prison officer placed a note in Plaintiff's medical record. (*Id.* at ¶12). The note indicated that despite instructions to avoid prolonged sitting or standing and to use orthotics and a cane, Plaintiff was observed playing football for "approximately 45 minutes and was running, jumping, throwing, and catching." (*Id.*).

Starting in early December, 2012, Plaintiff began reporting to the podiatrist for regular treatment of his wound including removing damaged tissue and applying Silvadene, a cream used to prevent and treat infection. (*Id.* at ¶13).

According to medical staff, as of April 12, 2013, Plaintiff had refused wound care twenty-one times. (*Id.* at ¶14). Plaintiff further refused to attend his scheduled podiatry appointment on May 3, 2014. (*Id.* at ¶15). Additionally, notes from a May 2013 appointment indicate that Plaintiff both refused crutches and had been removing the accommodation "designed to offload weight from his big toe in order to help his ulcer heal. The doctor noted 'poor patient compliance.'" (*Id.* at 16).

On June 5, 2013, a nurse treating Plaintiff's wound noticed serosanguinous drainage and consulted with Dr. Garikaparthi who requested a culture be sent to the lab for analysis. (*Id.* at 54). Plaintiff again refused crutches at this appointment. (*Id.*) A week later the lab results showed "the growth of Staph aureus and Pseudomonas. (*Id.* at ¶18). The following day Dr. Garikaparthi met with Plaintiff for the first time. The doctor noted Plaintiff's "pertinent past history, addressed pain management, and started

Plaintiff on antibiotics...." (*Id.* at 55-59).

At Plaintiff's second and last visit with Dr. Garikaparthi on October 10, 2013, the doctor was concerned by the appearance of Plaintiff's wound and sent plaintiff to the Triage and Treatment Area ("TTA") for "an antibiotic injection for immediate onset, to have two oral antibiotics and Tylenol with Codeine for pain control initiated, and continued daily dressing changes." (*Id.* at ¶19.) An x-ray was negative for osteomyelitis. As of the October 10 appointment, Plaintiff had twenty-six documented refusals of wound care. (*Id.*)

Plaintiff was then sent to Alvarado Hospital for treatment, staying there from October 14 to October 23, 2013. (*Id.* at 68). Medical staff believed Plaintiff had chronic osteomyelitis and septic arthritis in his right big toe. (*Id.*). During his hospitalization, various medical professionals urged Plaintiff to consent to having his big toe amputated, which Plaintiff repeatedly refused. (*Id.* at ¶21). As such, a "less than optimal" treatment plan was devised, including intravenous antibiotics that would control but not resolve the infection. (*Id.*).

Dr. Sedighi documented Plaintiff's refusals of and noncompliance with treatment through to October 24, 2013, noting that Plaintiff had been counseled against refusing treatment and the likelihood that without treatment he was increasing his risk of a "higher level" amputation, sepsis, or death. (*Id.* at ¶23). Dr. Sedighi indicated that Plaintiff "verbalized understanding but states that he does not want to have IV antibiotics." (*Id.*). Further, Dr. Sedighi indicated he would be referring Plaintiff for a psychiatric evaluation to determine whether Plaintiff's capacity to make medical decisions was impaired. (*Id.*). Two days later, a psychologist determined that Plaintiff did not seem to be having urgent mental health

4

problems. (*Id.* at ¶24).

On October 31, 2013, Plaintiff was seen by Dr. Currier, who noted that Plaintiff checked himself out of the treatment center against medical advice. (*Id.* at ¶25). Dr. Currier explained to Plaintiff in great detail, including hand-drawn diagrams, what was happening internally with Plaintiff's toe, summarized the recommendations from all of the medical professionals who had opined on Plaintiff's condition, and that the consensus was that amputation was necessary. (*Id.*). Further, Dr. Currier explained that as Plaintiff had refused amputation, the next best option was IV antibiotics, which Plaintiff also refused. Dr. Currier's notes indicate that Plaintiff was only willing to take oral antibiotics and that medical staff did not agree with this plan. (*Id.*).

In notes from December 19, 2013, Dr. Kandkhorova stated that he told Plaintiff that his condition would not resolve with medication alone and that amputation was necessary, but that Plaintiff refused. (*Id.* at ¶26). Plaintiff was again taken to Alvarado hospital on January 8, 2014, after additional documented refusals of care, where records indicate that Plaintiff "…'again refused amputation,' but agreed to have … removal of necrotic tissue and cultures. Eight weeks of IV antibiotics were recommended to Plaintiff, but he would only agree to undergo four weeks…." (*Id.* at ¶28). Following this appointment Plaintiff reported a brief period of relief, however, by April 2014, Plaintiff was again complaining of worsening pain in his toe. (*Id.*).

Following five additional refusals of care, Plaintiff saw Dr. Bates on May 5, 2014, who ordered immediate transport to Tri-City Medical Center. (*Id.* at ¶30). The first, second, and third toes on Plaintiff's right foot were amputated for extensive osteomyelitis on May 7, 2014. (*Id.* at ¶31).

Plaintiff filed a number of 602-HC health care appeals with respect to

his right foot. (ECF No. 48-4 at ¶8). None of Plaintiff's appeals mentioned Dr. Garikaparthi. (*Id.* at ¶9). Dr. Roberts was tasked with responding to three appeals, HC 14051270, HC 14051455, and HC 15053483), each of which were filed after Plaintiff's toes had been amputated. (*Id.* at ¶10). The first of these, HC 14051270, was filed on June 2, 2014, and requested that Plaintiff be put back on medication that was supposedly discontinued without first seeing a doctor. (*Id.* at 9). Dr. Roberts indicated that interviewing and examining doctors noted Plaintiff's surgery wounds were healing well, that Plaintiff's treatment plan would change naturally without seeing a physician as he healed, and that physicians were reviewing his chart regularly to make any required adjustments. (*Id.* at ¶4).

The second appeal, HC 14051455, was filed on July 8, 2014 and contained Plaintiff's request for stronger medication. (*Id.* at 9-10). Plaintiff's appeal was partially granted, however Plaintiff was given Tylenol and a right foot orthotic because narcotics were not generally given two months after surgery. (*Id.* at ¶5).

Dr. Roberts' third and last involvement with Plaintiff's appeals process was on June 17, 2015, when Plaintiff's appeal, HC 15053483, requested shower shoes. (*Id.* at 8). Plaintiff's request for footwear was denied "as not being medically indicated." (*Id.* at ¶6). Dr. Roberts did not respond to any of Plaintiff's other health care appeals. (*Id.* at ¶8).

### III. LEGAL STANDARD

**A. Summary Judgment**

Rule 56(c) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for the granting of a directed verdict. Judgment must be entered, "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "If reasonable minds could differ," however, judgment should not be entered in favor of the moving party. *Id.* at 250-51.

The parties bear the same substantive burden of proof as would apply at a trial on the merits, including plaintiff's burden to establish any element essential to his case. *Liberty Lobby*, 477 U.S. at 252; *Celotex v. Catrett*, 477 U.S. 317, 322 (1986); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The moving party bears the initial burden of identifying the elements of the claim in the pleadings, or other evidence, which the moving party "believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982). More than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The burden then shifts to the non-moving party to establish, beyond the pleadings, that there is no genuine issue for trial. *See Celotex*, 477 U.S. at 324. To successfully rebut a properly supported motion for summary judgment, the nonmoving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all

7

15cv0059-BEN-MDD

reasonable inferences made in the plaintiff['s] favor, could convince a reasonable jury to find for the plaintiff[]." *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citing Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 323; *Liberty Lobby*, 477 U.S. at 249).

While the district court is "not required to comb the record to find some reason to deny a motion for summary judgment," *Forsberg v. Pacific N.W. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988), *see also Nilsson v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988), the court may nevertheless exercise its discretion "in appropriate circumstances," to consider materials in the record which are on file but not "specifically referred to." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). However, the court need not "examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could be conveniently found." *Id.*

In ruling on a motion for summary judgment, the court need not accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). "No valid interest is served by withholding summary judgment on a complaint that wraps nonactionable conduct in a jacket woven of legal conclusions and hyperbole." *Vigliotto v. Terry*, 873 F.2d 1201, 1203 (9th Cir. 1989).

Moreover, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). Nevertheless, "the district court may not disregard a piece of evidence at the summary stage solely based on its self-serving nature." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497-498 (9th Cir. 2015) (finding

plaintiff's "uncorroborated and self-serving" declaration sufficient to establish a genuine issue of material fact because the "testimony was based on personal knowledge, legally relevant, and internally consistent.").

A district court may not grant a motion for summary judgment solely because the opposing party has failed to file an opposition. *Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 & n. 4 (9th Cir. 1994). A court may, nonetheless, "grant an unopposed motion for summary judgment if the movant's papers are themselves sufficient to support the motion and do not on their face reveal a genuine issue of material fact[.]" *Williams v. Santa Cruz Cnty. Sheriff's Dep't*, 234 F. App'x 522, 523 (9th Cir. 2007) (citing *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993)).

## IV. DISCUSSION

Plaintiff brings two claims. (ECF No. 4). Claim 1 alleges that Defendant Dr. Garikaparthi violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by failing to provide Plaintiff with adequate medical treatment. (ECF No. 4 at 3). Claim 2 alleges that Defendant Dr. Roberts similarly violated Plaintiff's Eighth Amendment right by not fulfilling his obligation in his supervisory capacity to ensure that Plaintiff's medical needs were being adequately met. (*Id.* at 4).

**1. 11th Amendment Immunity**

Defendants argue that as they were sued in their official capacities only, they are not "persons" under 42 U.S.C. § 1983, and as such are immune from suit under the Eleventh Amendment. (ECF No. 48-2 at 17).

The Supreme Court has recognized that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Absent a waiver by the state or a valid congressional override, the Eleventh Amendment offers state agencies immunity from private causes of action for damages brought in federal court. *Dittman v. California*, 191 F.3d 1020, 1025-26 (9th Cir. 1999). The State of California has not waived its immunity under the Eleventh Amendment for § 1983 claims. *Id.* In addition, the Supreme Court has held that Congress did not intend for § 1983 to abrogate a state's Eleventh Amendment immunity. *See id* (citing Kentucky v. Graham, 473 U.S. 159, 169 n.17 (1985)).

Accordingly, the Court **RECOMMENDS** that defendants Garikaparthi and Roberts are entitled to summary judgment with respect to Plaintiff's official capacity claims for damages. *See also Hafer v. Melo*, 502 U.S. 21, 30 (1991) (clarifying that the Eleventh Amendment does not bar suits against state officials sued in their individual capacities, nor does it bar suits for prospective injunctive relief against state officials sued in their official capacities).

### 2. Deliberate Indifference

In the FAC, Plaintiff claims that between October 2012 and May 2015, he repeatedly complained about a painful infection in his big toe and that Dr. Garikaparthi "failed to take [his] condition seriously and prescribe [him] with the appropriate medical treatment." (ECF No. 4 at 3). Plaintiff further alleges that Dr. Garikaparthi's treatment only involved bandages and foot cream, which were "all superficial and did not affectively address the underlying problem of [his] infection. (*Id.*). Defendants argue in their motion that Dr. Garikaparthi was only involved in Plaintiff's medical care in three specific instances and that the medical record lacks any support for the theory that Dr. Garikaparthi was deliberately indifferent. (ECF No. 48-2 at 19-20.)

10

To succeed on an Eighth Amendment claim predicated on the denial of medical care, a plaintiff must establish that he had a serious medical need and that the defendant's response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); see also *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A serious medical need exists if the failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Jett*, 439 F.3d at 1096. Deliberate indifference may be shown by the denial, delay, or intentional interference with medical treatment, or by the way in which medical care is provided. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

To act with deliberate indifference, a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). Failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.*

It is important to differentiate common law negligence claims of malpractice from claims predicated on violations of the 8th Amendment's prohibition of cruel and unusual punishment. In asserting the latter, "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105-06); see also *Toguchi v. Chung*, 391 F.3d

1051, 1057 (9th Cir. 2004). Plaintiff must show a deliberate disregard for a known medical need. The Ninth Circuit has made clear that a difference of medical opinion is, as a matter of law, insufficient to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058. "Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Id.* (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Deliberate indifference lies somewhere between negligence and "conduct engaged in for the very purposes of causing harm or with the knowledge that harm will result." *Farmer*, 511 U.S. at 836; see also *Redman v. County of San Diego*, 942 F.2d 1435, 1440 (9th Cir. 1991). To succeed on a deliberate indifference claim, a plaintiff must also demonstrate that the prison official had a sufficiently culpable state of mind. *Farmer*, 511 U.S. at 839-40. Thus, an official must: (1) be actually aware of facts from which an interference could be drawn that a substantial risk of harm exists; (2) actually draw that inference; but (3) nevertheless disregard the risk to the inmate's health and wellbeing. *Id.* at 837-38.

Here, the signed declarations filed with defendants' motion indicate that Plaintiff had two in-person interactions with Dr. Garikaparthi, each resulting in medical treatment increasing in intensity. Additionally, it was Dr. Garikaparthi who ordered lab tests of Plaintiff's serosanguinous drainage, started Plaintiff on antibiotics, and referred Plaintiff to the TTA. Indeed, Dr. Garikaparthi's involvement in Plaintiff's treatment resulted in Plaintiff receiving medical treatment beyond bandages and cream.

Under the circumstances of this case, it would be likely that a trier of

12

fact would determine that Plaintiff's complaints amounted to a serious medical condition. However, there are no facts to support a finding of deliberate indifference. Plaintiff saw medical personnel frequently and was provided with substantial treatment for his complaints. At the same time, Plaintiff repeatedly refused treatments and frequently refused to heed the recommendations of medical staff.

Of importance is the fact that Dr. Garikaparthi did not work as a physician at RJD for the entirety of the time Plaintiff alleges the doctor ignored his requests for treatment. Plaintiff alleges that his complaints of pain span from October 2012, to May 2015. Dr. Garikaparthi only worked at RJD from May 2013 to November 2014. Dr. Garikaparthi provided a consultation to a nurse regarding Plaintiff's toe ulcer on June 5, 2013, and then Dr. Garikaparthi met with Plaintiff on June 13, 2013 and October 10, 2013. Plaintiff alleges that he repeatedly complained to Dr. Garikaparthi about his increasingly painful infection, but the medical record shows that Plaintiff only had the opportunity to complain twice. Further, both of those meetings resulted in increased and more advanced treatment.

Plaintiff has not supported his contention that Dr. Garikaparthi's indifference to Plaintiff allowed the infection to spread and ultimately led to the amputation. To the contrary, the medical record shows that the only indifference here was that of Plaintiff toward his own medical care. Plaintiff was repeatedly advised that failure to acquiesce to more advanced treatment or amputation of his big toe had the potential to lead to more serious medical issues up to and including death. Despite these warnings, Plaintiff attempted to substitute his own medical opinion, rejecting IV antibiotics for the less favored oral antibiotics, only willing to take four weeks' worth of antibiotics instead of the recommended eight. The undisputed medical facts

13

show that it was only Plaintiff who disregarded the substantial risk of serious harm.

Although Plaintiff alleges in the complaint that Dr. Garikaparthi was deliberately indifferent in violation of Plaintiff's Eighth Amendment rights from October 2012 to May 2015, Plaintiff has presented no evidence of that or of any purposeful act or failure on the part of the doctor.

Accordingly, the Court **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's deliberate indifference claim.

### 3. No liability for involvement in the appeals process

Plaintiff argues that he sent Defendant Dr. Roberts several letters indicating he was not receiving adequate treatment on his toes and expressing concern that he would lose his foot. (ECF No. 4 at 4). Plaintiff asserts that Dr. Roberts was aware of Plaintiff's condition through institutional correspondence and that his failure to satisfy his supervisory responsibility to ensure Plaintiff was being adequately treated constituted deliberate indifference. (*Id.*). Defendants argue that Dr. Robert's involvement was limited to responding to some of Plaintiff's 602-HC appeals and that that limited involvement does not open up Dr. Roberts to liability. (ECF No. 48-2 at 25). Further, Defendants assert that there is no vicarious liability for civil rights violations. (*Id.* at 24).

"Prison officials are not required to process inmate appeals in a specific way or respond to them in a favorable manner." *De Bose v. Schmidt*, No. 2:15-cv-1076-EFB (TEMP) P, 2016 U.S. Dist. LEXIS 75504, at *3 (E.D. Cal. June 9, 2016). "Inmates lack a separate constitutional entitlement to a specific prison grievance procedure." *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003). A prisoner is entitled to the procedural right of a grievance

process, but this does not then bestow upon the prisoner any substantive right. *Rios v. Paramo*, No. 14cv1073-WQH (DHB), 2015 U.S. Dist. LEXIS 117271, at *155 (S.D. Cal. June 29, 2015). A prison official's denial of an inmate's grievance or appeal from a misconduct finding generally does not constitute significant participation in an alleged constitutional violation sufficient to give rise to personal liability. *See Wilson v. Woodford*, 2009 U.S. Dist. LEXIS 25749, 2009 WL 839921, *6 (E.D. Cal. 2009).

Here, Dr. Roberts' role as an appeals officer does not contribute to a claim for an 8th Amendment violation. Additionally, Dr. Roberts did not serve as Dr. Garikaparthi's supervisor and therefore could not be held labile for failure to properly supervise Dr. Garikaparthi. As established by the dates of the 602-HC appeals that Dr. Roberts addressed, his participation in Plaintiff's case began after Plaintiff's toes were amputated and months after the last contact between Plaintiff and Dr. Garikaparthi. (ECF No. 48-2 at 22). Plaintiff alleges no facts that indicate Dr. Roberts personally treated Plaintiff. Plaintiff's conclusory statements in the Complaint do not establish how Dr. Roberts' involvement in reviewing three 602-HC appeals constitutes a significant involvement in an alleged Eighth Amendment violation sufficient to establish personal liability.

Accordingly, this Court **RECOMMENDS** that summary judgment be **GRANTED** as to Dr. Roberts' participation in the appeals process.

**4. Qualified immunity**

Defendants raise qualified immunity as an alternative basis for dismissal of Plaintiff's claims. Defendants contend that they are entitled to qualified immunity because there is no clearly established authority that would find their conduct unconstitutional. (ECF No. 48-2 at 30).

Qualified immunity shields government officials performing

discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016) (quoting *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)). The Court may decide which of the two prongs to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, as discussed above, there is no constitutional violation. Accordingly, both Defendants are entitled to qualified immunity.

Based on the lack of any evidence of an Eighth Amendment violation and Defendants' entitlement to qualified immunity on this claim, the Court **RECOMMENDS** that their motion for summary judgment be **GRANTED**, and that this action be **DISMISSED**.

## V. CONCLUSION

For the reasons outlined above, **IT IS RECOMMENDED** that the District Court issue an Order: (1) Approving and Adopting this Report and Recommendation; and (2) **GRANTING** Defendants' motion for summary judgment.

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties no later than **October 30, 2017**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objection shall be filed with the Court and served on all parties no later than **November 6,**

**2017.**  The parties are advised that the failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See *Turner v. Duncan,* 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Dated:   October 16, 2017

Hon. Mitchell D. Dembin
United States Magistrate Judge